# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | )   Case No. 7:21-cr-00233-LSC-SGC |
| STAFFORD NAKIA COLEMAN, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This matter is before the undersigned on a motion to suppress filed by the defendant, Stafford Nakia Coleman. (Doc. 18).[1] After the Government responded to the motion, the parties presented witness testimony and video footage from police dashboard and body cameras during a hearing held on March 10, 2022, and then submitted additional briefing. (Docs. 21, 43, 44). For the reasons discussed below, the undersigned recommends the court grant the motion.

## I. Findings of Fact

1. In the early morning hours of August 21, 2020, Alexander Albaradei, an officer with the Tuscaloosa Police Department (the "TPD"), and his partner, TPD Officer Wesley Horton, were working a "proactive patrol" on the west side of Tuscaloosa, Alabama, which Officer Albaradei described as a high crime area.

---

[1] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

2. The officers observed a Cadillac Escalade with dark tinted windows driving with only one headlight.

3. The officers initiated the lights, but not the siren, on their patrol vehicle at approximately 1:14 A.M.  The defendant, who was driving the Escalade, pulled from the left to the right lane of the roadway approximately 10 seconds after the officers initiated their lights; turned on his right blinker approximately 20 seconds thereafter; and brought his vehicle to a full stop approximately 12 seconds later.  Officer Albaradei testified that between the location where the officers initiated their lights and the place where the Escalade came to a full stop, there were six places where the defendant could have pulled off the road.

4. Officer Albaradei approached the driver's side window and told the defendant he stopped him because he was driving with only one headlight.  The defendant replied, "I, I just got it put on," pointing to the left headlight, and "this one went out," pointing to the right headlight.

5. Officer Albaradei testified that the defendant appeared "extremely nervous" during this initial interaction.  Video footage from Officer Albardei's body camera shows the opposite: the defendant appeared relatively calm and collected.  He was not shaking and did not exhibit other observable signs of nervousness.

6. The defendant was not able to produce his driver's license or recite his driver's license number, but he did, without hesitation, provide Officer Albaradei

with his full name; birth date, based on which Officer Albaradei would have known the defendant was 44 years old; and Social Security Number. Officer Albaradei then returned to his patrol vehicle to run the information through dispatch, while Officer Horton remained posted on the passenger's side of the Escalade.

7. As Officer Albaradei was running the information, TPD Officer David Roach and his partner, TPD Officer Such,[2] responded to the scene. Officer Roach approached Officer Albaradei's police vehicle, while Officer Such posted himself on the driver's side of the Escalade.

8. The dispatch officer relayed to Officer Albaradei that the defendant had a valid driver's license and was an Alabama probationer with drug convictions and non-extraditable warrants from the City of Homewood, the City of Irondale, and Cullman County.

9. Officer Albaradei then told Officer Roach the stop was probably a "good one," by which he meant the Escalade might contain contraband or other evidence of criminal activity, noted it took the defendant "forever" to pull over, and stated he was going to try to get consent to search the vehicle.

10. At this point, the officers were not waiting on any information or taking any steps to issue a warning or write a ticket.

---

[2] Officer Such's first name has not been made part of the record.

11. Officer Albaradei re-approached the Escalade from the driver's side.  As Officer Albaradei did so, Officer Horton moved from the back passenger's side of the vehicle to the window on the front passenger's side and shined his flashlight through the open window, while Officer Such moved from the back driver's side of the vehicle to a position closer to Officer Albaradei on the driver's side.

12. Officer Albaradei asked the defendant for consent to search the Escalade. The defendant declined.  Officer Albaradei then mentioned it took the defendant "so long" to pull over, which the defendant contested, explaining he initially thought the officers were going to pass him.  At some point during the stop, Office Horton told the plaintiff he probably did not see the lights on the police vehicle because of the dark tint of the Escalade's windows.

13. While Officer Albaradei and the defendant were discussing the length of time it took the defendant to pull over, Officer Roach detected the odor of marijuana coming from the vehicle.  He approached the open window on the front passenger side and observed a green leafy substance that appeared to be marijuana on the center console.[3]

---

[3] The defendant questions whether what Officer Roach smelled or saw rose to the level of probable cause justifying a warrantless search.  Because the undersigned does not reach the question of probable cause, the undersigned does not elaborate on the details of Officer Roach's observations.

14. At that point, Officer Roach walked around to the front driver's side window and asked the defendant to show him the green leafy substance. The defendant picked it up, flicked it down, and told Officer Roach it was just ash.

15. Officer Roach removed the defendant from the vehicle, after which Officer Roach and Officer Albaradei conducted a search. The search revealed marijuana, Ecstasy, and a firearm inside the Escalade.

16. The officers then arrested the defendant and read him his *Miranda*[4] rights. During his transport to a county jail, the defendant made inculpatory statements regarding the drugs and firearm found inside the Escalade.

17. The indictment in this case charges the defendant with possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1).

**II. Legal Arguments**

The defendant makes two arguments for suppression of the evidence obtained from the Escalade and the inculpatory statements he made when confronted with that evidence. First, he argues Officer Albaradei unlawfully extended the traffic stop when he initiated the second interaction to request consent to search the vehicle. It was during this interaction that Officer Roach detected the odor of marijuana coming from the Escalade and observed what appeared to be marijuana on the center console, which the Government asserts provided probable cause to search the

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

vehicle.  In other words, the defendant argues the evidence and statements should be suppressed because his detention had become unlawful by the time Officer Roach made the olfactory and visual observations on which probable cause was based. Second, the defendant argues Officer Roach's observations did not, in fact, provide probable cause to search the Escalade.  To the extent the court denies his motion to suppress, the defendant reasserts his request to review potential *Giglio*[5] material submitted in camera pursuant to a protective order.  The undersigned concludes the defendant's first argument for suppression is meritorious and, therefore, does not address the defendant's second argument for suppression or the renewal of his request to review potential *Giglio* material.

## III. Conclusions of Law

### A. Constitutional Framework

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  The Government bears the burden of proving the reasonableness of a warrantless search or seizure.  *United States v. Knight*, 336 F. App'x 900, 904 (11th Cir. 2009) (citing *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983)).

---

[5] *See Giglio v. United States*, 405 U.S. 150 (1972).

"[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment]." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). "A law enforcement officer may legally stop an automobile traveling on the highways if he has probable cause to believe that a traffic violation has occurred." *United States v. Purcell*, 236 F.3d 1274, 1276 n.5 (11th Cir. 2001) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)); *see also United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003) (reciting same standard); *United States v. Garcia*, 284 F. App'x 791, 793 (11th Cir. 2008) (same).[6]

"It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest." *Purcell*, 236 F.3d at 1277. "Therefore, [courts] analyze the legality of these stops under the standard articulated in [*Terry v. Ohio*, 392 U.S. 1 (1968)]." *Id.* To pass constitutional muster under *Terry*, "an officer's actions during a traffic stop must be reasonably related in *scope* to the circumstances which justified the interference in the first place," and "the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." *Id.* (internal quotation marks omitted).

---

[6] The defendant does not challenge the basis for initiating the traffic stop.

The Supreme Court most recently addressed the lawful scope and duration of a traffic stop in *Rodriguez v. United States*, 575 U.S. 348 (2015).  The Court explained "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (internal citation omitted).  "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." *Id.* (internal quotation marks omitted and alteration adopted).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id.*

The mission of a traffic stop includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355.  These are "ordinary inquiries incident to the traffic stop" and "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* at 355-56 (internal quotation marks omitted and alteration adopted).

Tasks and inquiries unrelated to the mission of a stop are those "aimed at detecting criminal activity more generally," such as asking about a passenger's gang affiliation and using a dog to search for contraband. *United States v. Campbell*, 26

8

F.4th 860, 882 (11th Cir. 2022) (internal quotation marks omitted) (interpreting *Rodriguez*), *petition for cert. docketed*, Case No. 21-1468 (U.S. May 23, 2022).

"But whether an inquiry is 'related' or 'unrelated' doesn't end [the] analysis." *Id.* "Unrelated inquiries are permitted so long as they do not add time to the stop." *Id.* On this point, the Eleventh Circuit recently clarified in *Campbell* that while its pre-*Rodriguez* precedent asked whether the length of the stop as a whole was reasonable and permitted brief, or *de minimis*, prolongations of a stop, *Rodriguez* rejected that standard. *Id.* at 879, 882-84, 882 n.17. Under *Rodriguez*, "the length of time [by which unrelated inquiries extend a stop] is immaterial. *Id.* at 884.[7] An extension of the stop by any amount of time violates the Fourth Amendment, unless (1) an officer possesses reasonable suspicion of other illegal activity or (2) the initial detention has become a consensual encounter. *Id.* at 883-84; *United States v. Ramirez*, 476 F.3d 1231, 1237 (11th Cir. 2007).

Here, therefore, the initial question is whether Officer Albaradei's second interaction with the defendant to request consent to search the Escalade was related to the mission of the stop. If not, the next question is whether the interaction added time to the stop. If so, the final questions are whether Officer Albaradei had reasonable suspicion to extend the stop for the purpose of making the unrelated

---

[7] The Government's briefing seems to overlook *Rodriguez's* rejection of a standard that permits brief, or *de minimis*, prolongations of a stop.

inquiry and whether the initial detention had become a consensual encounter. *See Campbell*, 26 F.4th at 884, 884 n.20 (framing the inquiry similarly and noting most circuits that have addressed *Rodriguez* have reached a similar conclusion).

**1. Second Interaction to Request Consent Was Unrelated Inquiry**

The second interaction Officer Albaradei initiated with the defendant for the purpose of requesting consent to search the Escalade was not related to the mission of the traffic stop but, rather, aimed at investigating other criminal activity. To the extent the Government cites *Purcell* for the proposition an officer's request for consent to search a vehicle is related to the mission of a traffic stop, it fails to account for *Rodriguez*, which post-dates *Purcell*, and its progeny.[8] A Georgia federal district court recently concluded "the blanket proposition that officers can always ask for consent to search during a traffic stop is no longer good law after *Rodriguez*." *United States v. Keith*, 2021 WL 6340985, at *4 (S.D. Ga. Dec. 2, 2021), *report and recommendation adopted*, 2022 WL 95287 (S.D. Ga. Jan. 10, 2022). The court reasoned the conclusion is "clear from *Rodriguez* itself" and reinforced by the Eleventh Circuit's post-*Rodriguez* decisions in *United States v. Vargas*, 848 F.3d 971, 972 (11th Cir. 2017), and *United States v. Forget*, 853 F. App'x 534 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 471 (U.S. 2021). *Id.* at *4-5.

---

[8] In *Purcell*, which was decided under a pre-*Rodriguez* framework for analyzing the lawful scope and duration of a traffic stop, the Eleventh Circuit made the general observation "[a]n officer conducting a routine traffic stop may request consent to search the vehicle." 236 F.3d at 1281.

In *Vargas*, the Eleventh Circuit rejected the argument an officer's request to search the defendant's vehicle unlawfully prolonged a traffic stop, reasoning the officer had not completed his duties related to the stop at the time he made the request.  848 F.3d at 974.  Implied in this conclusion is that the request to search was not, itself, related to the mission of the stop and, thus, was permissible only if made during a period of otherwise lawful detention.  In *Forget*, the appellate court went further, holding an officer's request to search a vehicle, although "not related to the purpose of the stop," which was to address a seatbelt offense, did not unlawfully extend the stop because it "occurred simultaneously with [another officer's] inquiries into [the unbelted passenger's] identification, and thus [] did not add any time to the stop beyond the time it took to complete inquiries incident to the seatbelt violation."  853 F. App'x at 539.

The undersigned agrees with the reasoning and conclusion of *Keith* and rejects any argument by the Government it was permissible for Officer Albaradei to ask for consent to search the Escalade because the request was related to the mission of the traffic stop.  The undersigned does not suggest there are no circumstances under which a request for consent to search may be related to the mission of a traffic stop. Here, however, the Government did not elicit any testimony from Officer Albaradei or the other TPD officers that would suggest a nexus.  On the contrary, Officer Albaradei's testimony indicates he requested the defendant's consent to search the

11

Escalade for the purpose of determining whether there was contraband or other evidence of criminal activity in the vehicle. *See also United States v. Anguiano*, 791 F. App'x 841, 849-50 (11th Cir. 2019) (holding officer departed from mission of stop when he sat in patrol car with another officer and discussed possible options for searching truck to determine if it was being used for drug trafficking).

### 2. Unrelated Inquiry Added Time to Stop

The unrelated inquiry discussed above added time to the traffic stop. Neither Officer Albaradei nor any other officer on the scene was engaged in any task related to the mission of the stop when Officer Albaradei made the request to search the Escalade. Binding precedent mandates this conclusion, even though Officer Albaradei's second interaction with the defendant extended the stop by a matter of seconds before Officer Roach detected the odor of marijuana emanating from the Escalade. *See, e.g., Campbell*, 26 F.4th at 885 (holding extension of traffic stop by approximately 25 seconds to ask questions unrelated to mission of stop unlawfully prolonged stop); *Keith*, 2021 WL 6340985, at *4-5 (holding traffic stop became unreasonable in scope and duration when officer detoured from original purpose to request consent to search vehicle for purpose of investigating other potential crimes when no task related to completion of stop were being performed). As discussed, if Officer Albaradei had made the request while completing tasks related to the mission of the stop in a reasonably diligent manner, the inquires would not have added time

to the stop and would have been permissible.  *See Vargas* (discussed *supra*); *Forget* (discussed *supra*); *Keith*, 2021 WL 6340985, at *5 (noting "officers are permitted to ask for consent to search so long as the question is posed while active progress is being made to complete the traffic stop"); *cf. United States v. Braddy*, 11 F.4th 1298, 1312 (11th Cir. 2021) (holding dog sniff conducted while officer was conducting routine records check and preparing traffic citation did not unlawfully prolong traffic stop).  Because he did not, extension of the stop for the purpose of requesting consent to search the Escalade was permissible only if there was reasonable suspicion the defendant was engaged in illegal activity beyond violations of the traffic code or the initial detention had become a consensual encounter.

### 3. Reasonable Suspicion Was Lacking

"While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  *Braddy*, 11 F.4th at 1310 (internal quotation marks omitted). Something " 'more than an inchoate and unparticularized suspicion or hunch'" is required.  *United States v. Byron*, 817 F. App'x 753, 757 (11th Cir. 2020) (quoting *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)).  "In determining whether reasonable suspicion is present, [a court] looks at the totality of the circumstances of [a] case to see whether the detaining officer has a particularized

13

and objective basis for suspecting legal wrongdoing." *Braddy*, 11 F.4th at 1310-11 (internal quotation marks omitted).

The Government asserts five factors coalesced to provide reasonable suspicion to extend the traffic stop and request consent to search the Escalade: (1) the length of time it took for the defendant to pull over after officers initiated the lights on their police vehicle; (2) the defendant's "nervous" behavior during his interaction with officers; (3) the fact that the defendant could not produce his driver's license; (4) the defendant's criminal history; and (5) the defendant's presence in a high crime area at night, a time when as a general matter crime is even higher.

### a. Asserted Reluctance to Stop

" 'Reluctance to stop' is a factor that "may contribute to the formation of an objectively reasonable suspicion of illegal activity" justifying extension of a traffic stop. *Anguiano*, 791 F. App'x at 848 (quoting *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999)). Here, however, there is not an objective basis for finding the defendant was reluctant to stop. It took the defendant 42 seconds to pull over after Officer's Albaradei and Horton initiated the lights on their police vehicle. This was not so unreasonable an amount of time to respond to the flashing lights as to raise suspicion in the mind of a reasonable officer, even if there were multiple places where the defendant could have stopped during those 42 seconds. *Compare Byron*, 817 F. App'x at 759 (holding officer reasonably could have concluded defendant

was reluctant to pull over based on the approximately one minute and 22 seconds it took the defendant to come to a complete stop and the defendant's brief return to the road after moving halfway onto the shoulder),[9] *with United States v. Jenson*, 462 F.3d 399, 405 (5th Cir. 2006) (holding the 30 seconds to one minute it took for defendant to pull over was a "reasonable amount of time for [the defendant] to respond to the flashing of the emergency lights" or, at least, a "modest delay in stopping time" that "d[id] not by itself . . . give rise to reasonable suspicion").

This conclusion is reinforced by consideration of additional contextual factors. *See United States v. Williams*, 409 F. Supp. 3d 1340, 1345 (M.D. Ga. 2019) ("An innocent traveler could have a number of valid reasons for failing to immediately pull over for a police officer (e.g., failing to see the officer's lights, not having a shoulder to pull on to, confusion).").  The dark tint of the Escalade's windows could have obscured the police vehicle's lights and delayed the defendant's perception of them, even though generally speaking the lights of a police vehicle are more visible at night.[10]  Moreover, the defendant's driving maneuvers suggest that after noticing the officers' lights he initially was not sure whether the officers were

---

[9] The court in Byron ultimately held that even if the officer reasonably could have inferred the defendant was reluctant to stop, that reluctance to stop, alone, did not provide reasonable suspicion to extend the traffic stop.  817 F. App'x at 759-60.

[10] Although not necessarily relevant to the court's objective analysis of reasonable suspicion, the undersigned notes that at some point during the stop the defendant told Officer Horton he initially did not see the officers' lights.  This was the point at which Officer Horton told the plaintiff he probably did not see the lights because of the dark tint on the Escalade's windows.

15

signaling for him to stop: the defendant pulled from the left to the right lane approximately 10 seconds after the officers initiated their lights, suggesting he thought the officers might pass him; turned on his right blinker approximately 20 seconds thereafter, suggesting he then understood the officers were trying to initiate a stop and intended to pull off the road; and brought his vehicle to a full stop approximately 12 seconds later.[11] Taking into account the dark tint of the Escalade's windows and the defendant's driving maneuvers, the undersigned cannot conclude the defendant demonstrated a reluctance to stop that would have contributed to a particularized and objective basis for suspecting legal wrongdoing.

### b. Asserted Nervousness

Nervousness is "a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). However, "some level of nervousness is to be expected from a motorist as a result of being momentarily detained by an authority figure with police power over him." *Byron*, 817 F. App'x at 758 (internal quotation marks omitted) (upholding district court's determination that, contrary to Government's assertion, video of traffic stop showed defendant "did not exhibit nervousness out of the ordinary for a motorist stopped 'on a hot September night in Georgia'"); *see also United States v. Perkins*, 348 F.3d 965, 970-

---

[11] Although, again, not necessarily relevant to the court's objective analysis of reasonable suspicion, the undersigned notes the defendant explained to Officer Albaradei he initially thought the officers were going to pass him.

71 (11th Cir. 2003) (holding there was no reason for officer to reasonably suspect driver's repetition of officer's questions evidenced anything other than normal nervousness attendant to temporary police detention); *United States v. Boyce*, 351 F.3d 1102, 1108-09 (11th Cir. 2003) (holding officer did not have reasonable suspicion to extend traffic stop because, *inter alia*, video of officer's encounter with defendant belied officer's testimony defendant was unusually nervous).

Officer Albaradei's body camera footage refutes Officer Albaradei's testimony the defendant was "extremely nervous" during the initial interaction. It shows the defendant was not shaking and did not exhibit other observable signs of nervousness that would have been unusual for the circumstances. Although the defendant repeated the word "I" in telling Officer Albaradei he just had one head light replaced, repetition of that single word could hardly be labeled a stutter. On the whole, the defendant appeared relatively calm and collected. At the very least, he did not appear any more nervous than reasonably would be expected for an individual detained in the dark, early-morning hours by authority figures with police power over him.

### c. Inability to Produce Driver's License

" '[H]aving no proof of authority to operate [a] vehicle'" is another factor that may contribute to reasonable suspicion. *Anguiano*, 791 F. App'x at 848 (quoting *Pruitt*, 174 F.3d at 1220). Here, however, while the defendant was not able to

produce his driver's license, he did without hesitation give Officer Albaradei other identifying information – his name, birth date, and Social Security number – and Officer Alabardei used that information to confirm the defendant had a valid driver's license before he initiated the second interaction.  The undersigned fails to see how a defendant's mere inability to produce his driver's license could contribute to suspicion criminal activity beyond a traffic infraction was afoot when the defendant provided other identifying information that proved to be legitimate and permitted an officer to confirm the defendant, in fact, was licensed to drive.

### d. Criminal History

A driver's criminal history likewise may contribute to the reasonable suspicion calculus.  *See United States v. Simeon*, 752 F. App'x 822, 824 (11th Cir. 2018) (holding the totality of the circumstances, including defendant's arrest warrant for fraud, supported reasonable suspicion to extend traffic stop); *United States v. Harris*, 347 F. Supp. 3d 1233, 1239 (S.D. Fla. 2018) (acknowledging relevancy of this factor as a general matter).  The Tenth Circuit nonetheless has cautioned a criminal history by itself is insufficient to create reasonable suspicion because "[e]ven people with prior convictions retain Fourth Amendment rights."  *United States v. Santos*, 403 F.3d 1120, 1132-34 (10th Cir. 2005) (holding defendant's criminal history *and denial of that history* were "genuinely suspicious" and, together with other factors, supported reasonable suspicion under *Terry* to detain defendant).

In the context of analyzing the legality of a *Terry* frisk,[12] the Eleventh Circuit has indicated not only that a defendant's criminal history alone is insufficient to establish reasonable suspicion but, also, that the factor deserves little weight relative to other factors a court may consider.  *United States v. Bishop*, 940 F.3d 1242, 1249, 1249 n.4 (11th Cir. 2019) (holding that while officers' knowledge defendant had been an inmate at the county jail – together with defendant's non-compliance, argumentativeness, and nervous, agitated behavior following lawful orders to exit truck – would have caused reasonably prudent officer to fear for his safety or that of his fellow officers, its decision "d[id] not rest primarily on the [officers'] knowledge of [the defendant's] criminal history," which factor was entitled to "little weight relative to the other factors").  This is because "using a defendant's criminal history alone to establish reasonable suspicion may subject all individuals with any type of criminal record to a *Terry* frisk."  *Id.* at 1249 n.4.

The undersigned finds that here the defendant's criminal history is entitled to little, if any, weight in the reasonable suspicion calculus not only for the reason articulated by the Eleventh Circuit in *Bishop* but, also, because of the limited nature of the information Officer Albaradei possessed with respect to that history.  Officer Albaradei learned from the dispatch officer that the defendant was an Alabama

---

[12] Under *Terry*, "[a]n officer may [] frisk a legally detained individual for weapons if he reasonably believes that his or others' safety is threatened."  *United States v. Bishop*, 940 F.3d 1242, 1248 (11th Cir. 2019) (citing *Terry*, 392 U.S. at 27).

probationer with drug convictions and non-extraditable warrants from the City of Homewood, the City of Irondale, and Cullman County.  The dispatch officer did not tell Officer Albaradei the offense for which the defendant was on probation, the age of the defendant's drug convictions, or alleged conduct underlying the warrants, and Officer Albaradei did not seek that information from the dispatch officer.  The undersigned cannot say a middle-aged man's mere status as an Alabama probationer with an unspecified number of drug convictions of an undetermined age and non-extraditable warrants for unknown alleged offenses contributed in a meaningful way to suspicion the defendant was engaged in criminal activity beyond a traffic infraction.  *See Harris*, 347 F. Supp. 3d at 1240 (holding defendant's two-and-a-half year old drug charge did not contribute substantially to creating reasonable suspicion of criminal activity that justified dog sniff); *Williams*, 409 F. Supp. 3d at 1345 (holding the fact that defendant was on state probation and parole for two separate offenses may have contributed to a hunch defendant's car contained illegal contraband but did not support reasonable suspicion under *Terry*).

### e. Presence in High Crime Area

"[T]he fact that [a] stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis."  *Wardlow*, 528 U.S. at 124; *see also United States v. Fields*, 127 F. App'x 890, 892 (11th Cir. 2006) (collecting cases in which Eleventh Circuit has found defendant's presence in high crime area to be

20

relevant factor in determining reasonable suspicion).  However, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124; *see also United States v. Monzon-Gomez*, 244 F. App'x 954, 960 (11th Cir. 2007) (recognizing the limitation articulated in *Wardlow*). Likewise, a person's presence in a high crime area at night or very early in the morning is relevant to, but not dispositive of, reasonable suspicion.  *United States v. Hill*, 752 F.3d 1029, 1035-36 (5th Cir. 2014) (addressing defendant's presence in high crime area at 11:00 P.M.); *United States v. See*, 674 F.3d 309, 314 (6th Cir. 2009) (addressing defendant's presence in high crime area at 4:30 A.M.).

Consistent with the foregoing, the Eleventh Circuit has found reasonable suspicion where there were contextual considerations other than just a defendant's presence in a high crime area to support reasonable suspicion.  *See, e.g., Fields*, 178 F. App'x at 892 (holding officers had reasonable suspicion to detain defendant based on tip, defendant's presence at house known for high drug activity, and defendant's evasive behavior); *Monzon-Gomez*, 244 F. App'x at 960 (holding officers had reasonable suspicion to detain defendants where defendants made numerous inconsistent statements to officers, were driving a refrigerated trailer not properly equipped to transport refrigerated produce, and had spent an hour or more in an abandoned driveway in a known drug area).  Where, however, the only contextual

consideration available to heighten suspicion created by a defendant's presence in a high crime area at an unusual hour is a defendant's uncompelling criminal history, courts have reached the opposite conclusion.  *See Harris*, 347 F. Supp. 3d at 1240 (holding defendant's presence in high crime area, criminal history that "was hardly extensive," and nervousness not uncommon for the circumstances did not create reasonable suspicion to conduct dog sniff); *Williams*, 409 F. Supp. 3d at 1345 (holding defendant's presence in high crime area after midnight may have contributed to a hunch defendant's car contained illegal contraband but, even coupled with defendant's criminal history, did not support reasonable suspicion under *Terry*).  To conclude the presence of a person with a criminal history in a high crime area after dark creates reasonable suspicion to extend a traffic stop "would effectively render the Fourth Amendment a nullity" to a "sizable portion" of citizens. *See Harris*, 347 F. Supp. 3d at 1240.

### 4. Encounter Had Not Become Consensual

As an initial matter, the undersigned notes the Government does not contend the defendant's detention had become, or became, a consensual encounter when Officer Albaradei initiated the second interaction during which he requested consent to search the Escalade.  The undersigned addresses the question in the interest of thoroughness.

There is no bright-line test for determining whether a traffic stop has shifted from a Fourth Amendment seizure to a consensual encounter.  *Ramirez*, 476 F.3d at 1240.  Moreover, an officer is not required to inform a person a traffic stop is over or that he is free to go for the encounter to be consensual.  *United States v. Burwell*, 763 F. App'x 840, 845 (11th Cir. 2019) (citing *Ohio v. Robinette*, 519 U.S. 33, 35 (1996)).[13]  Instead, courts examine the "totality of the circumstances" to determine whether a shift has occurred.  *Ramirez*, 476 F.3d at 1240 (internal quotation marks omitted).  These circumstances include:

> whether there is any police coercion[;] whether the exchange is cooperative in nature[;] [] whether the defendant had everything reasonably required to leave[;] . . . whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect[;] and the language and tone of voice of the police.

*Burwell*, 763 F. App'x at 845 (citing *Ramirez*, 476 F.3d at 1240; *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011)).  The "ultimate inquiry remains whether 'a reasonable person would feel free to terminate the encounter.'"  *Ramirez*, 476 F.3d at 1240 (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)).

---

[13] In *Robinette*, the Court held an officer is not required to tell a lawfully seized individual he is free to go before the individual's consent to search will be deemed voluntary.  519 U.S. at 35.  In the interest of clarifying apparent confusion evidenced by the Government's briefing, the undersigned notes the legality of a person's continued detention and the voluntariness of consent given by a person who is legally detained are two separate and distinct issues.  *See, e.g., United States v. Triana*, 760 F. App'x 768, 772-73 (11th Cir. 2019) (analyzing the issues separately).

23

Clearly, the defendant would not have felt free to go at the time Officer Albaradei initiated the second interaction. Officer Albaradei gave no explicit or implicit indication he had concluded the stop, and three police officers were posted around the defendant's vehicle, with one officer shining a flashlight through the open window on the front passenger's side . *Cf. Ramirez*, 476 F.3d at 1240 (holding traffic stop became consensual encounter when defendant chose to answer officer's question posed after officer returned defendant's license, handed him a traffic citation, and told him traffic stop was over); *Burwell*, 763 F. App'x at 845-46 (holding traffic stop became consensual encounter when defendant chose to answer officer's question posed after officer returned licenses of defendant and his passenger, explained warning to defendant, and gave defendant written warning). Again, the undersigned notes the Government makes no argument to the contrary.

## B. Application of Exclusionary Rule

In sum, the undersigned concludes Officer Albaradei unlawfully prolonged the defendant's detention when, without reasonable suspicion or conversion of the traffic stop into a consensual encounter, he added time to the stop by initiating a second interaction with the defendant for the purpose of requesting consent to search the vehicle for contraband or other evidence of illegal activity. The undersigned now turns to the question of whether suppression of evidence obtained as a result of the unlawful prolongation of the stop is the appropriate remedy.

"The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009).  The rule is a "judicially created" one "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* (internal quotation marks omitted).  It applies "only where it results in appreciable deterrence," and the deterrent value of the rule "varies with the culpability of the law enforcement conduct." *Id.* at 140, 143. (internal quotation marks omitted and alteration adopted). Suppression is appropriate "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge" a search or seizure violated the Fourth Amendment.  *Id.* at 143; *see also Davis v. United States*, 564 U.S. 229, 241 (2011) ("Responsible law enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules.").  Additionally, "the benefits of deterrence must outweigh the costs," the "principal cost" being "letting guilty and possibly dangerous defendants go free – something that offends basic concepts of the criminal justice system." *Herring*, 555 U.S. at 141 (internal quotation marks omitted).

Guided by these principles, and in consideration of the fact the Government makes no argument with respect to application of the exclusionary rule, the undersigned concludes suppression is appropriate here. *Rodriguez* had been the standard for the lawful scope and duration of a traffic stop for five years by the time

of the defendant's stop, as a consequence of which the TPD officers involved must be charged with knowledge of its requirements.  The undersigned finds application of the exclusionary will result in appreciable deterrence of future Fourth Amendment violations, the benefits of which outweigh the social costs of the rule's application. *See Keith*, 2021 WL 6340985, at \*6 (suppressing evidence obtained during unlawfully prolonged traffic stop that occurred four years after *Rodriguez*); *see also Anguiano*, 791 F. App'x at 848 (noting evidence obtained as a result of an unlawfully prolonged stop "must generally be suppressed"); *Chanthasouxat*, 342 F.3d at 1280 (noting that "[a]s a general rule evidence gathered as a result of an unconstitutional stop "must be suppressed").

The Fourth Amendment violation requires suppression of not only the evidence obtained from the Escalade but, also, the statements the defendant made when confronted with that evidence, because "the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (internal citation and quotation marks omitted); *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of [unconstitutional conduct].").  This includes "admissions or confessions that the police induce by confronting a suspect with evidence obtained

through an illegal search or seizure." *United States v. Timmann*, 741 F.3d 1170, 1182 (11th Cir. 2013); *see also United States v. Santa*, 236 F.3d 662, 678 (11th Cir. 2000) (noting "*Miranda* warnings do not, *without more*, dissipate the taint" of unconstitutional conduct) (internal quotation marks omitted).   The undersigned notes the Government bears the burden of demonstrating evidence was not obtained as a direct result of an illegal search, *Timmann*, 741 F.3d at 1182, and in this case has made no attempt to do so.

## IV. Recommendation

For the foregoing reasons, the undersigned **RECOMMENDS** the court **GRANT** the motion to suppress (Doc. 18).

## V. Notice of Right to Object

Either party may file specific written objections to this report and recommendation within fourteen (14) days.   Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order.   In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice.   11th Cir. R. 3-1.   Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is

made and the specific basis for objection.  A copy of the objections must be served on opposing counsel.

**DONE** this 4th day of August, 2022.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE